The next case on the calendar is United States v. Eldred. The next case on the calendar is United States v. Eldred. May it please the Court, my name is Barclay Johnson. I'm pleased to be here on behalf of Mr. Eldred but also Mr. Scanlon. These are the three cases that were consolidated. And I understand you're going to be arguing for 20 minutes? About 15 minutes, Your Honor. And five minutes in rebuttal on behalf of both of them. Right. I plan to address good faith and also whether a warrant was required. And Mr. McGuire will address the Rule 41 issues. This case is different from those that have resolved this claim by relying on the good faith exception for at least two reasons. The record is different and the claims here are different and more expansive. Not all courts have been presented with a record as robust as it is here, as to what the government agents, lawyers, and executives know and did. The record is largely undisputed. The claims, not all courts have considered these claims. We've argued, for instance, that the warrant itself was expressly limited to the Eastern District of Virginia and facially deficient as to any search outside the district. Reliance on it was objectively unreasonable or reflected deliberate misconduct. We've also argued that deterrence is not the sole goal of the exclusionary rule. And we've argued that Leon itself demands that the actions of the government as a whole be considered and that the collective knowledge doctrine isn't a one-way street simply for the government to use to catch criminals. And I think it's important to note at the outset that as much as we argue this point, it is the government that bears the burden here of proving that the good faith exception applies. Turning to the government's actions, it's well established that when the government exhibits deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the good faith exception will not apply. And we think the record here amply demonstrates that the government acted recklessly or with gross negligence when it sought a warrant that it knew was beyond the scope of Rule 41 and 28 U.S.C. 636 and that its own internal operating guidelines told it not to seek. So we know the government knew that Rule 49 would not authorize this warrant because the government began seeking an amendment to Rule 41 in the months after a decision from the Southern District of Texas declined to issue a similar warrant. And we know that this was ñ Well, how does that establish that the government knew that Rule 41 wouldn't apply? I mean, it could establish that it belled in suspenders. They wanted to make it perfectly clear, but they had an argument that they believed would persuade courts, has persuaded some courts, that this was an appropriate tracking warrant. I think we know that this became or was the official government position because it wrote to Judge Raji and the Rules Committee saying this type of warrant isn't authorized by Rule 41. And I think that's a fair characterization, especially because the government's own internal manual says in a situation like this, you should go to every judicial district where there's going to be a search and get a warrant there. That really wouldn't be possible in the way this warrant operated, right? Because you wouldn't know where, what districts the search was going to take place if we assume the search takes place where the device, at the point when the electronic communication reaches the laptop of the people that have accessed the site. I don't think that's necessarily true. The government has offices in every judicial district. It could do just what its manual said and get a warrant in every judicial district. The specifics of how it would do that I think are beyond the scope of this case. Right, but am I wrong? I'm just trying to make sure I understand the computer aspects of this. Yes. Given the way this operation was set up, in order to ensure that you've gotten a warrant by that interpretation, you'd have to get a warrant in every judicial district in the United States. That may be the case. The government certainly knew ahead of time, and the testimony I think is undisputed, that there were tens of thousands of playpen users. The agents testified that, yes, we knew that this would be executed across the United States and throughout the world ultimately. Again, I think that the Southern District of Texas case ultimately represents the government's view. It is evident both from its interactions with the Rules Committee and also its own internal manual. And sometimes warrants are drafted by unsophisticated actors or law enforcement officers with little or no legal support. But this isn't one of those cases. As we point out, the warrant was reviewed by multiple attorneys and executives within the Department of Justice. It involved several layers of management within the Department of Justice and the FBI, including lawyers at the computer crime and intellectual property section. Well, as I said, I think it's definitely the same warrant. I think the record here is more robust as to what the government knew, what actions it took. But it's also our claims are different. So not only are we arguing about the government's actions, what it knew ahead of time, we're also arguing, for example, that the warrant some of them were and some of them weren't. But what hasn't been extensively or really much at all, our claim that the warrant is limited on its face to the Eastern District of Virginia and reliance on it was, therefore, unreasonable or reflected deliberate misconduct. And so the warrant itself, and I'll refer to Mr. Eldred's appendix, is there at appendix page 31. There's just nothing in the actual. I don't think so, Your Honor. I think that under especially this Court's decisions in In Re. 655th Avenue, if we look at the warrant, there's just nothing in it that permits or specifies or hints at some authorization to search computers in every judicial district in the United States, not to mention the rest of the world. Correct, Your Honor. Well, I want to answer that in two ways. One, I mean, there was a search using the NIT, it did, and the record's undisputed, the computer program goes to the defendant's computer, takes nonpublic information from that computer. So the government is going into the computer with that first warrant. Can I ask, in Eldred, the lower court said, well, to the extent that this is about IP addresses, you don't have any reasonable expectation of privacy in your IP address. I know that you say it went beyond that, but could you just address that? Would this have been a search if all that had been obtained was the IP address? I think that's a closer question. I think there's reason to think that, you know, obtaining IP addresses is distinct from the pen trap register, you know, that's approved. I can't remember if it's Miller or Smith, but, you know, that was a very limited operation. Those are phone numbers. Right, whereas this is, you know, it's something both larger in scale, ultimately, in this case. But it's also something that, you know, the defendants here, the allegation is that they tried to hide it, and went through extraordinary lengths to keep this piece of information confidential. It's a closer question, but ultimately, I think it's one the Court need not address because the record's undisputed that several other nonpublic pieces of information were obtained from the defendant's computer. But turning back to the warrant, while the application and affidavit provide more detail, if we look at the warrant, there's just nothing there that says, you may search outside the Eastern District of Virginia. The application and affidavit, they're not incorporated using the deliberate and unequivocal language of incorporation that this Court has said you have to use if you're going to incorporate other documents. Attachments A and B, which is what the government offers, provides some clarity. We don't think that helps. It's not clear to start with that the C attachment A language, for instance, serves to incorporate these, given that this Court's conclusion that that language simply references an underlying – language that simply references an underlying affidavit or document doesn't incorporate it. And even if it did, there's nothing in attachment A, for example, that says search computers outside the Eastern District of Virginia. All the government is relying on in attachment A, and this is at Joint Appendix 32, is the negative implication of not saying it's limited to the Eastern District of Virginia. And we think the idea that that negative implication somehow conveys authority to search every single computer in all the judicial districts just doesn't pass muster. I think the difference here that the whole reason the activating act here is your clients reach into the Eastern District of Virginia. It's only the fact that the child porn site is accessed through a very circuitous, as you pointed out, secret mechanism that lends credence to the government's argument that everyone who accesses the site knows exactly what they're accessing. It's only that that causes this whole chain of events to begin, and that occurs in the Eastern District of Virginia. I don't think so. Mr. McGuire will address the Rule 41 issues, but I think the courts of appeals have been clear in rejecting that and saying the idea of a virtual trip is just too much. And the record ultimately is clear that the computer program involved comes to the defendant's computer, wherever that may be. Here it was in Vermont and Connecticut, and takes the information from there. I guess I keep circling back. If the information was limited to location information, I mean, I know your co-counsel is going to address the tracking information, but you begin with the premise that the search took place in all these other districts and the warrant says just the Eastern District. Right. But this is not the simplest case for coming to that conclusion. The simplest case is the other cases that you rely on where an Oklahoma judge or a Kansas judge issues a warrant to take place at a physical location in Oklahoma. Well, I think this case is perhaps more simple given the scope of what was asked for. I mean, there's nothing ordinary about this case in terms of what the government knew ahead of time, what its position was, what it knew about how this was going to be executed, that is, thousands of computers all across the United States and the world. And so I think the scope of that violation does make this an easier case. If it can't apply here, it's hard to see where it would apply. And maybe your colleague is going to address this, but now three circuits have ruled that the warrant was void ab initio. I wonder if that has implications for the good faith argument that haven't been perceived by some of the other circuit courts. I think it does to the extent that, as we talked about in the beginning, the government's official view ultimately, as we point out, is that the rule on its face doesn't permit this. And yet it went full ahead and asked the court to issue this warrant and then took a warrant that, as we pointed out, says nothing. The warrant, its attachments, says nothing about being executed, in this case in Vermont and Connecticut, but really throughout the United States, ultimately returning thousands of IP addresses within the United States. I think my time has expired, and I'll reserve some for rebuttal. Good morning. I'm James McGuire on behalf of Timothy Allen. So there are three topics that I'd like to touch on this morning. The third of the topics is this Rule 41 issue. But before getting to that, I think there are two important things to note. One is this issue of a constitutional violation we've identified in our briefing regarding the nature of the website itself. So we've pointed to, and in fact I think this is important, as something other courts have generally failed to address. There was a very recent Seventh Circuit decision that I think came out just this morning or yesterday that does briefly address the nature of the website and the — specifically the banner, the two-color images that appear on page 3 of defendants' reply brief. But generally, circuit courts have not addressed this. And in fact, the First and Fourth Circuits wrongly assume that the site that defendants accessed during the course of this operation was a site in which there were two young girls with legs sprayed. That is factually untrue, and the government agrees. Instead, defendants, including Mr. Allen, who visited the site four days after the government took over the website, visited a site with a very different banner. And this is important because the government, I think, would like to make the suggestion that this is the dark web. This is a place where criminals lurk, where people should be suspected for visiting the site. But the reality is, short of what appears on that first website, there is nothing the government can point to that actually points to criminality on the part of a person visiting that site. So your argument, this logo went from two sexually suggestive minors being depicted to one minor being depicted, and you — your argument is that it wasn't — the photograph is not as sexually suggestive, and this was material and defeated, should have been disclosed to the magistrate? Correct. And I think that — and the importance here, and I want to raise a concern, which is that there's a suggestion that because it was difficult to find this site, because it may appear on sexual message boards, that, therefore, there was already reason to think anyone visiting would know that this was child porn. And what I want to suggest is that maybe there's a reason to believe this is sexual content. But sexual content, particularly sexual content that may be embarrassing, may be scorned, but is not illegal, is the sort of expressive behavior, the sort of privacy interest that is important and really is meaningfully threatened. It's a real reason for being on tour. Second, what I would suggest is all of those terms on their face are not specific to child porn. Within the website, there is content that is. But this warrant is not for all individuals who visit specific parts of the website. And so in addition to the concern that there really — that this was an operation that extended outside of even the warrant that was issued, I want to suggest this is important because the government would suggest that this is a case in which government operatives behaved very carefully and scrupulously. And here, they really did not. At the very best, they operated, having made a representation to the magistrate, operated in a manner that was not consistent with that. And this is not an everyday case. This is not an agent breaking down a door. This, as noted, was a massive operation that had massive privacy interests across the world and had substantial collateral consequences. The Supreme Court has said every distribution of child porn is a separate harm. The government was willing to impose those harms, and it did so. Secondly, we'd like to, I think, respond to Judge Chen's question, you know, are all the other circuits really wrong? What have they done wrong? And I think the — this also relates to the question of what does it mean that this was a warrant that multiple circuits to — the circuits to address it have agreed are — is void ab initio. What I'd suggest is this. We are, here in 2018, addressing a question of whether the Burke case, decided in 1975, is still good law about 10 years after the Herring case, strongly suggested, at least in its totality, it probably isn't. And what that says is that this is an unusual situation. This is a point that is in — That doesn't help your argument, does it? So I think that it does. And the reason is this. Help me out. Sure. Circuit courts generally have taken a binary, either we're in the pre-Leon sort of Burke-derived era of this is a per se rule, or courts have then reverted just to the narrow categories of circumstances described in Leon. But Leon, for example, wouldn't apply in a case of a completely warrantless search. And what it suggests is that Leon suggests circumstances in which there's been a failure within the process, but that the general process is intact. A completely warrantless search in which there's just a decision to go bang down a door is a direct assault on that process. The circumstances here where the government — Herring, which is part of Leon's progeny, didn't that — correct me if I'm misremembering it, but Herring involved — they thought there was a warrant, they checked a database, but due to a court-clerk era, the warrant had actually been vacated. So there wasn't a warrant. A search took place without a warrant, and the Court said good faith applies. And what it suggests is that Herring doesn't provide the specific criteria to consider here, that it does suggest that there is balancing, but that it is not enough to do what other circuits have done and simply revert to Leon and act like this is just a question of probable cause. What happened here did deprive other magistrates, other judges, of the ability to make this important decision. As indicated by my co-counsel, there are many reasons to have serious concerns about the government's good faith here, in addition to what I have identified with respect to the website. Finally, turning to the Rule 41 issue, this is a subject that all circuit courts to have addressed it have agreed on. We do understand there are a minority of district courts that have initially came out the other way. I think what to say about that is that, one, I think we start with the language of the rule. There is nothing in the rule that suggests that the government is allowed to enter computers and obtain information and cause those computers, essentially seizing them, to transfer information. And that the rule really doesn't suggest you can do that, and I think that's why all circuits to have addressed it agree. This is a technical issue. This is new technology. It's certainly possible to make mistakes, to think, looking on the surface, that maybe what was happening was tracking. But what I think is important is to hear both what the device did and what it didn't do. What the government did was enter a computer, obtain information that went beyond simply the IP address. And as I said, compelled the computer then to transmit this information. The government was clear, this is a search for specific pieces of information. Sort of tried to — No, it is specific pieces of information that would allow the government to know where the — what — where the computer — what computer had accessed this website. So it does broadly feel like they sought location information. They didn't ask for a horn on this site, what else is at this computer. They just sought information that was relevant to location. So I think that, first, that's not entirely correct. It obtained things like the operating system of the computer, which really has nothing to do with its location. So it was beyond simply location. I think an analogy — and it is difficult to try to find the real-world analogy. It's sort of a — and we suggest this in the briefing — like the government snuck a camera somehow into someone's house and is able to look at a letter sitting on a table. Now, the government has entered that person's — So I think that that question — if the answer to the question is, well, not much of an invasion, I think then it's not — So there's also a MAC address, which is another identifier. There's a — it returns information about whether the NIT had been downloaded before, all of which suggests — and to know, for example, the operating system. I think what the NIT is doing is looking inside that computer. I don't think that there would be a question from the Court saying, if the government entered someone's house only blindly, only to look to see if a piece of mail had a particular address on it, that that would be a less serious search, that the government may choose not to read the entire letter. It was a K-class from the Supreme Court. The Court — the police officer went inside the suspect's car to see the vehicle identification number, and that wasn't a search because you have no expectation of privacy in that vehicle identification number. So leaning into the car to see it when it wasn't visible from the outside. And what I'd say is, again, this is a search of more information than just the location information. This is also — and I think that, you know, the Supreme Court has recognized that digital devices are far more private than what we expect in a car. What the government has clearly demonstrated the capability to do here is to peer inside someone's most personal files. Now, the government may say that it didn't do that, but the nature of the invasion is into that deeply protected private area. It's not just a VIN number essentially visible nearly from the street. Can I just ask a question about the argument that the warrant was void ab admission? If we agree with that argument with regard — because a magistrate was not authorized to issue this warrant, isn't the Rule 41, whether it was violated or not, this warrant went beyond the scope of the Magistrates Act? So it's void even if there — even if it had been authorized, even assuming it was authorized by Rule 41? We certainly don't disagree. That's not, frankly, extensively briefed in what we've done. I'm aware other courts have identified that as an additional concern. And, of course, it is important to point out that Rule 41 is essentially incorporated into the Magistrates Act, that no matter what, we're not just talking about a procedural rule problem. We are talking about fundamentally the authorizing statute that even gives magistrates the ability to do anything at all. Please support. Assistant United States Attorney Jacoby Rodriguez-Coss from the District of Connecticut, Your Honor. I represent the government in Timothy Allen v. United States. With me at council table is Assistant United States Attorney Barbara Masterson from the District of Vermont, and she represents the government in Robert Eldred v. United States and Christopher Scanlon v. United States. I will address the issues of whether the NITT warrant was authorized under Rule 41 before, and assuming arguendo that it was not, whether the good-faith exception applies. Ms. Masterson will address the issue of whether the NITT is unconstitutional within the framework set forth in United States v. Burke, or whether a technical violation of Rule 41 took place, and if so, whether that conclusion stands as an obstacle to the application of the good-faith exception. And so I would agree with defense counsel in one thing. This was not an ordinary case. The appellants in three cases before the Court took calculated and intentional steps to disguise and hide their criminal conduct. They used technological tools to hide their location and their identity and make it impossible for law enforcement officers to use traditional forms or traditional process to identify or locate them. And they did that in order to navigate the dark web and access Playpen, which was a website wholly dedicated to child pornography. As all of the sister courts that have addressed this warrant thus far have noted, the sexual exploitation of children on the Playpen website was massive. Over 150,000 users had registered within the first six months. There had been over 95,000 postings in over 9,000 topics all related to child pornography. And it also included forums on how to groom victims and how to avoid law enforcement detection. And so faced with what was a pretty incredible criminal venture, an FBI agent, and adding the challenges of the anonymizing steps that had been taken by each of the appellants in these cases, an FBI agent in the Eastern District of Virginia proposed to use a NIT, a network investigative technique, a new electronic technological tool that had been developed by the FBI, to track information from the Playpen website. And he did what every agent should do. He drafted a long and detailed affidavit explaining exactly what the NIT was, how it would function, and where it would go for a search warrant and presented it to a neutral and detached magistrate judge. And that neutral and detached magistrate judge evaluated that application for the existence of probable cause and determined that probable cause existed and issued the warrant. And so this agent reasonably and in good faith relied on that warrant in executing the NIT. And so... And so we would disagree with that, Your Honor. I think the warrant... Yes, sir. It is explained in the affidavit that the warrant would apply to any activating computer, that is, any computer being operated by a user who accessed the Playpen website, registered with a username and password, and entered that website. And that is exactly how it is described. Does it say any activating computer wherever located? Yes, sir, it does. Any activating computer wherever located. And so in that sense, we argue that the NIT operated sort of as a tracking device under Rule 41b-4. But before I get to that point, let me say that regardless of whether there was a Fourth Amendment violation here, the facts of the case certainly support what 7 now, because counsel is correct, the Seventh Circuit did issue an opinion in United States v. Owens, and we apologize. We received notice of it this morning. We will file the appropriate 28-J letter. Joining the other Sixth Circuit courts, the First, the Third, the Fourth Circuits all finding in reviewing this exact NIT warrant that the agents here acted in good faith, and that is that there would be no deterrent value in suppressing the evidence in this case and that the agents obtained the warrant and acted in good faith. And I would agree with the Court when it says that there were at least 18 district courts who have found that this was actually a valid warrant issued under Rule 41b-4. And, in fact, at least one of the tracking device theory. Yes, ma'am. All of them. Yes, ma'am. And, in fact, one dissenting no circuit court has done that. In the Eighth Circuit opinion of United States v. Horton, one dissenting judge, Judge Ferner, agreed that it would have been a valid warrant under Rule 41b-4, albeit in his dissent. But what that indicates, Your Honor, is that the warrant was certainly facially valid. There would have been to task an FBI agent with determining or knowing ahead of time that this would have eventually, if that is what the court does, that this would have eventually been deemed an invalid warrant is far too onerous in the field of computer tracking devices for two reasons. One, the government had obtained similar tracking device warrants sooner. They had obtained NIT warrants in several other cases, as it's referenced in United States v. Laurita. And, two, 18 district courts have reviewed this warrant and determined that it was a validly-issued warrant. And so we must also consider that behind each of those 18 district courts, a magistrate judge had to have issued a residential warrant in those districts. And each of the residential warrants issued here, that is, the second warrant obtained in the District of Vermont and the second warrant obtained in the District of Connecticut, also included the information about the NIT warrant was, it described how it functioned, where it operated, and how it was that the FBI came to obtain the IP addresses of the appellants, so that we have a second magistrate judge in our respective districts looking at the warrant, being apprised of the facts that would have led to an unconstitutional finding or an invalidation of that original warrant, and issuing a warrant. So the government would argue, in addition, that on the United States v. Ganias, recently decided by this Court, the second agents, the agents in Vermont and the agents in Connecticut, certainly relied on that second residential warrant in good faith, having had no reason to know that what they were doing was unconstitutional. And the other thing I would like to ask on the tracking advice theory, I – it seems plausible to me, the analogy and looking at the precedent that looks at Rule 41 with some flexibility, that you're seeking location if it had been limited to IP addresses. So the computer accesses the porn site, and something is inserted to get the IP address. But I don't understand the other information that's – So the traditional tracking device that we usually think of when we think of a tracking device, the mechanical device that we normally put underneath a vehicle, anticipates that we know what that vehicle looks like. We've identified that vehicle. We can run the license plate and know who drives it and who it's registered to. In the realm of computers, if you will, we are now at an age where, in a particular residence, multiple electronic devices can be housed. And so the spirit of that, the requested information, was to follow the information, the digital content of the website, to the computer where it was ultimately resting, and then identify the computer in a way that we would be able to distinguish that computer from other electronic devices within that residence. And so that is where these other pieces of information become relevant. What is the host name? That is correct. Right. So – and we would argue that not just the IP address, but none of the pieces of information really hold a privacy interest. Now, in this case, we understood we needed to get a warrant because the computer was located inside the appellant's home. It wasn't in a public place. So, in Caro Knott's, the old tracking device cases, those were about public movements and you could use the beeper to track, but you couldn't use the beeper once it had gone inside the home to confirm that the package was still there. Exactly. But in this particular case, that's why we obtained a warrant, because we knew that the NIT would be entering the computer in someone's home. But the remaining part of the information would help us distinguish that computer from other electronic devices within the house. How about the information that it had accessed the child porn site before, that this was not the first NIT? Wasn't one of the pieces of information? One of the pieces of information was, Your Honor, to – and that was for logistical purposes to see if the NIT had already been deployed to that specific computer. How did that help in identifying the computer? Well, it probably didn't help so much in identifying the computer as much as it just told us, this is one we've already identified. So it cut down on the legwork that the law enforcement agents would then do following identification. But it – but that being information that we had deployed to that computer, I don't see how that would have violated the privacy interests of the defendants or the appellants here. So I – we do recognize and acknowledge that the Ninth Circuit and the Ninth Circuit in Henderson and the Third Circuit in Wardeen and the Eighth Circuit in Horton have expressly found that this was not a tracking device. But we would urge this Court to examine Rule 41b-4 in the context of computers, much in the way that this Court engaged in that analysis in United States v. Scott. We are talking about following digital information that communicates from one computer to another in a very, very, very short amount of time. Why would we do that in light of the change in Rule 41b-6 in particular? Well, clearly under the change for Rule 41, 41b-6, it is the government's contention that completely would have authorized, then it warrants. So that is why there is no deterrent. Why would we jump into the pool on tracking devices? I'm sorry, Your Honor? Why would we jump into the battle on tracking devices if we already have an answer? Well, you don't – I would submit that the Court doesn't have to jump into the pool of tracking devices. It's just a matter of if the Court wished to provide any guidance. But you don't need to jump into the pool. The government's position is the most direct avenue to affirmance in these three cases is through the good faith doctrine in Leon. And in that regard, let me just address counsel for Allen's point on the logo. I think their argument is somewhat disingenuous. When a magistrate judge considers the information presented on an affidavit to determine whether or not that affidavit is supported by probable cause, it doesn't parse out the pieces of information. It considers the information together. And in this particular instance, there were several pieces of information that led to that finding of probable cause. Certainly the fact that the appellants each took advantage of Tor, had to download the software to their computer. Then they had to navigate into the dark web. They had to know the exact address of the Playpen website. So the dark web does not function as the open web – the way we know it where you can search for a term in Google and find a website address. You have to know the address for that website or you had to have been provided the link to that website by someone who knew about the website. Once you arrived at that home page – Where do you find out? Does someone tell you the address for Playpen or you find it on some other site in the dark web? You could have found it in another bulletin board for child pornography in the dark web. That's right. And so once you arrive at that home page, you see the image in the case of a child, a prepubescent child, dressed in a very short dress, black fishnet stockings, and seated in a sexually suggestive manner next to the name Playpen. Certainly the site is not offering Playpens for sale. Next to that photograph are instructions on how to post images and videos. So you certainly know that you're about to enter a site that contains images and videos and the purpose is to view and exchange them. In addition to that, it instructs that you have to register with a username and password. And when you click on the link to register with a username and password, you get additional instructions to provide false information, to not provide information that could be used to identify you. And then there's the fact that it was, in fact, a child pornography website. So taking all of that information as a whole, as the Seventh Circuit recently stated in its opinion, it was very unlikely that the appellant simply stumbled upon this site or that once they arrived at that home page that they did not know that they were probably going to be accessing child pornography. And so the point of the government is it was not an intentional misrepresentation to the magistrate judge. It was a change that took place on the eve of the signing of the warrant. But even if the court were to decide that there was some sort of falsehood on the part of the agent, it certainly was not material to the finding of the probable cause. And so the Franks standard is simply not met in this case. And it does not stand as an obstacle to finding that the agents here acted in good faith and reasonable reliance on that warrant. How do you respond to counsel's argument about the government's letter to Judge Raggi and the government knew that this was incorrect? Well, I don't know that the government knew that it was incorrect. We certainly applied for knit warrants before and had obtained knit warrants before. And then we have the decision of the Texas court in In Re Warrant, where it denied the warrant. It was a more consistent decision by various magistrates in different districts. And so I think what the government did was seek clarification of the rule. We understood this was an electronic technology that we should be allowed to use to properly identify the location and identity of bad actors. And we sought clarification to do so. I don't think that we were compelled to wait for that clarification before continuing to attempt to use an electronic tool that we thought should be utilized to identify bad actors. All right. I will, with that, leave the floor to my colleague. Thank you. May it please the Court. Barbara Masterson from the District of Vermont. I will be addressing the Rule 41 violation, or rather, assuming that there is a Rule 41 violation. The question then becomes, how do we analyze that? Other courts have found that a Rule 41 violation occurred, or that it occurred and that it was of constitutional magnitude because the courts found that the warrants were void ab initio, void at the outset. That was the holding in Verdeen, Horton, and just yesterday in Henderson. Recognizing that precedent, those decisions are out there, the government continues to suggest to this Court that you don't need to follow that because the Fourth Amendment's requirements for a validly issued warrant were met in this case. The Supreme Court I'm just making sure I understand the argument about Section 636, which was new to me. But if I, reading then-Judge Gorsuch's concurring opinion, it doesn't, the Rule 41 violation seems irrelevant, that even with the new Rule 41 and its provision for knit warrants, if that argument is correct, going to a magistrate judge would still render an invalid warrant because of the Magistrate Act. And you could only use the tracking you could only use that new provision if you went to a district court. Am I understanding that correctly? I think you are, Your Honor. I saw that myself, and I thought that there's a disconnect now between the territorial limitations in Section 636 and the venue requirements that are in Rule 41. So I think that there is a disconnect. But the interest and when we think back on how could this have worked, we've talked about or conversations have occurred about what, you know, are we going to go to 94 different judges? Honestly, the way to make this thing happen was completely onerous. It would have required setting up 94 servers with the playpen website in every single district in the country and getting a separate warrant. That is what it appears that the defense or the appellants are wishing that they had happened, is that we had gone and gotten 90, set it up 94 servers, 94 separate warrants. And then for all the data that comes in, then we are only allowed to look at hits that came in Vermont from Vermont activated computers or Connecticut activated computers. And all of the other hits that happened on the server that was located in Vermont, we would have to ignore. That is a logistical nightmare. It is theoretically possible, which is I'll get to whether there was prejudice, because it could have happened that way. So there was no prejudice. It would have been incredibly onerous. It would not have been able to happen given the speed with which setting up the operation also had to happen. It's clear in the record that there was a seizure of a copy of the playpen website in January 2015. That was then set up at the server in the government-controlled server in Virginia. Then on February 18th, 19th, and 20 were when the playpen website was looked at to make sure that there were, you know, was it still up and running? And that was how the disconnect on the logo happened. But then on the 19th, the warrant is with Magistrate Judge Buchanan. There is a seizure, a separate seizure of the actual server in North Carolina and the arrest of the administrator in Florida. And why I bring this up is because if all that happened and then the data from the server in North Carolina was then overlaid onto, you know, it had to be added to the server in Virginia to make sure that it looked. But it had to happen quickly enough because people are pinging on that. I think I did the math, like 10,000 hits a day. And if there's a prolonged time when that website is down, people are going to get suspicious and we're going to lose possible targets who should be investigated because they are accessing this horrible site. So that's just a separate point that I wanted to bring up. Going back to the constitutional violation, there's no suggestion that the warrant that was presented to Magistrate Judge Buchanan in the Eastern District of Virginia, it had probable cause, it met the particularity requirement, and she was certainly a neutral and detached magistrate. That is all that is required in Dahlia. Bang U is not one of those requirements. So it is the government's position that the warrant was not, any violation was not As to whether it was void ab initio, I recognize, as I said earlier, three courts have said that the warrant was void ab initio. I do not think, though, that those courts have focused in on the fact that the warrant was applied against individuals in the Eastern District of Virginia. The McLamb case, which is the Fourth Circuit case that has been decided, that case started in the district where McLamb and his two co-appellants, I think there were three that were joined, but it certainly worked for McLamb. So at worst, it is partially invalid, not void at the outset. So there was a warrant. So with no constitutional violation, certainly we can go right to good faith and all of the courts that have evaluated this, the circuit courts have evaluated this warrant. The good faith exception certainly applies if the warrant was not a Rule 41. So the argument is that if the magistrate judge had authority to authorize a search in Virginia, the warrant may have been overbroad and that it was authorizing searches outside the district, but it can't be void from the start because the magistrate had the authority to authorize the Virginia search. That's the government's position, Your Honor, yes. With respect to whether, and I'm going to the Burke framework where you look first, is there a constitutional violation? We believe that there is not. And then looking at Burke, the second inquiry is if there's, is there a technical violation? And that analysis looks at whether there's prejudice and whether there was any intentional disregard for the rule. I think the Court has heard a lot today about the care with which the government approached getting the warrant in Virginia, the clarity and transparency with which the government approached getting this warrant and doing the operation to ensure that we checked all the appropriate boxes, that we were not accused of overreaching. And I think it's telling also, I mean... Can I just ask on Burke itself? I mean, we haven't talked, we're going back to a case decided in the 1970s, and the opinion takes pains to say we should be wary of extending the exclusionary rule beyond areas of constitutional magnitude. It's, and we're talking about statutory violations here, but it's all written before Leon and its progeny, so should we be accepting the Burke framework as the appropriate one for looking at the statutory? I know your argument is even accepting it, your side prevails. But is Burke really the right way to think about the exclusionary rule given Leon and its progeny? We think no, that it is not. And we suggested to the Court in our briefs that it's time to revisit the viability of Burke in light of Leon. Because, I mean, it would make absolutely no sense, Your Honors, if a constitutional violation in a search warrant, that can be evaluated under Leon good faith. That's a given. But if there's a technical violation and the warrant gets reviewed under Leon good faith, that is a complete disconnect. But you would be suppressing for a violation of a rule of criminal procedure in a context where you would not suppress for a constitutional violation. Right, and that's completely backward. It just isn't the way the law is right now. And as a last thought on prejudice, since I see my time's almost up, prejudice as framed, I mean, the government says the language used in Burke where the search might not otherwise have happened leaves open the possibility that there are other avenues by which the search could happen. We pointed out in our brief the Article III judge could be consulted or, as I said, let's put the server in every single district and get separate warrants in every single one. The way that the defense has or the appellants have suggested that it should be looked at is look at the individual and what this he would not have been searched for this. And looking at prejudice in that way is contrary to what Leon is teaching us. Leon wants, and all of this Supreme Court case law that follows from Leon, want to focus in on the actions of law enforcement. Is there deterrent value? Is there active government law enforcement misconduct that needs to be addressed? That is the focus, not on what happened to that individual. Because if there's a systemic problem, if that person is his or her rights are intentionally trampled upon, then that will be revealed through the good faith analysis under Leon. And that's the way Leon wants the Supreme Court has told the courts to look at this. If there are no further questions, I'll submit. Thank you, Your Honors. I'd like to start with one correction. It's not correct that the warrant itself, rather than the application or the affidavit, says activating computers wherever located. The warrant and its attachment merely says activating computers. The government's argument is that the fact that the preceding sentence says the servers in the Eastern District of Virginia, the negative inference is that the activating computers will be anywhere. We don't think that's a reasonable way to view it. And if you view it that way, there are particularity problems. Leon and its companion, Case Shepard, say consider all of the actors here. It's not just the agent who actually flips the switch, ultimately. From the beginning, Leon and Shepard expressly note, and Shepard considers, the role that government lawyers played. And that makes sense, given the collective knowledge doctrine. It's not a one-way street. And the courts that have declined to look beyond the actual agents executing this have, I think, failed to recognize that. And we'd ask the Court to recognize that Leon says it's necessary to consider everyone. We've also argued that deterrence is not the only goal of the exclusionary rule. Preserving judicial integrity is as well. And as I think everybody recognizes, there's nothing ordinary about this case. If the good-faith exception applies here, if the judiciary cannot condemn this Fourth Amendment violation, a violation this large, then the good-faith exception has succeeded in swallowing a good part of the exclusionary rule and in seriously impairing the ability of the judiciary to act as a meaningful check on executive authority. Judge Chin asked, or I think was gigging at, Gnaeus earlier, but that case, the rationale of the second warrant would only apply where the government has no significant reason to believe their predicate act was indeed unconstitutional. But for all the reasons we've said, the government had every reason to understand that the warrant, the original NIT warrant, did more than was authorized, including because the warrant on its face is limited to the court concluded the agents acted reasonably throughout their investigation. Here, as we know, the government acted against its better judgment. The Vermont warrant is fruit of the poisonous tree, and the collective knowledge doctrine tells us that the same agents, the same FBI agents, the same agency, the knowledge of the broader agency should be imputed. The government has cited the La Riga case and said they've had approval for other NIT warrants, but that's not entirely true. As we point out in our reply brief, there's three cases identified. Two of them were terrorism warrants where the rule would permit the NIT to be executed outside the issuing jurisdiction, and the actual La Riga. Right. It's, I think, B4, but I don't have it in mind. And the La Riga decision itself, while it approved, an NIT warrant came after this warrant was issued. Again, the letter, it's not just a clarification. It's the government saying ultimately, and we cite in our brief to the comments in the minutes, that the rule on its face doesn't permit this. And not only is there that acknowledgement, the government's own manual for years before even the decision from the Southern District of Texas has said, get a warrant in every district. Unless the court has other questions, I see my time is expiring. Okay. So I think briefly to return to the rule 41 issue and the tracking device question, I think there are two additional problems to point out. The first is that the rule requires that a tracking device be something that tracks movement. In this case, there is no effort to track movement of anything whatsoever. The government doesn't know and doesn't care where any information went between Mr. Allen's computer and the government server. It cares about a specific question, what computer accessed the site. Second, because it does care about where, because they need to get a second home to access the computer. Sure, it does care where that computer is, but again, doesn't care about movement. Also, because of the nature of... It is tracking the digital information. If I understand computers at all. There is a query into the Eastern District of Virginia. The instructions are inserted into your client to access the child porn site and instructions are inserted to follow it back, right? So there is a digital tracking back to the home computer. They weren't interested, as in your brief, Abley makes this point, they're not interested in every note along the way, but I don't think that means it wasn't in a broad sense tracking that information flow. So again, the government really has no information of that because the nature of TOR never enters the Eastern District of Virginia. Again, that's in the briefing. Briefly, you asked a question of where do you find a link to Playpen with respect to the logo. The answer to that is the government cannot say. You find a link wherever you find links. And again, I will warn of the concern that the government would say this turns out to be a child porn site. This is on the dark web. Not all things there are criminal. And just finally, I will add there was a suggestion from the government that it would have been onerous to go out and get lots of warrants from different districts. That's why the government successfully moved to change the rule. This is a situation in which the government elected to act first and get permission second. Can I ask one other question? Logo argument is the NIT installed after you see the page that says false don't put in your true biographical name or any true identifying information? The facts are that yes, you have to create an account. It is installed or at least the warrant authorizes installation before someone accesses any information. So again, the person may know that they are being anonymous, which is certainly the case of anyone on tour. But the warrant did not require access to child porn. Thank you all. Very nicely argued on both sides. We will take the case under submission.